**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| JOHN VINCENT BROZOWSKI, | Case No.: 3:26-cv-01871 |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| EQUIFAX INFORMATION SERVICES, LLC, | |
| Defendant. | |

**COMPLAINT**

Plaintiff John Vincent Brozowski ("Plaintiff"), by and through the undersigned counsel, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax" or "Defendant") and states as follows:

**INTRODUCTION**

1. This is an action to recover damages for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").

2. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory,

all of society should ultimately benefit from the resulting convenience and efficiency.

3.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

4.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

5.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the

personal, private, and financial information that they compile and sell about individual consumers.

7.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

8.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

9.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record

the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

10.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

11.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

12.     Plaintiff's claims arise out of the Defendant's inaccurate credit reporting, wherein the Defendant reported to Plaintiff's potential creditors that Plaintiff had failed to make timely payment on his Upgrade loan account—which

had been paid in full—and that the account has severely derogatory payment history of one hundred twenty (120) or more days past due.

13.    Accordingly, Plaintiff bring claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiff credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

14.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

15.    Plaintiff is a natural person who resides in St. Augustine, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.    Equifax is a nationwide consumer reporting agency that maintains its principal place of business at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309. Equifax regularly conducts business throughout the United States, including within this District.

17. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax regularly assembles, evaluates, maintains, and disseminates information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties.

18. The information Equifax collects, maintains, and sells includes sensitive details about consumers' finances, credit histories, payment histories, account statuses, address histories, application histories, and personal identifiers.

19. Consumers do not choose whether Equifax collects and maintains information about them, and Equifax profits from furnishing that information to creditors and other users who make decisions affecting consumers.

## JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p because Plaintiff's claims arise under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. (the "FCRA").

21. Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff resides in this District, Defendant transacts business in this District, and a substantial part of the events and injuries giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

### Plaintiff Pays the Uplift/Flex Pay Loan in Full and on Time

22.    Non-party Upgrade, Inc. ("Upgrade") identifies its Flex Pay product as formerly known as Uplift and has assumed responsibility for servicing and credit reporting concerning the Uplift/Flex Pay account at issue in this action.

23.    On July 20, 2022, Plaintiff obtained a six-month, closed-end loan through Uplift to finance roundtrip airfare on United Airlines.

24.    The loan was associated with account number ending in 1490 (the "Upgrade Account") and had an original high balance of approximately $1,865.20.

25.    The loan required six monthly payments of $333.82, beginning August 20, 2022 and ending January 20, 2023.

26.    Plaintiff timely made every required payment on the Upgrade Account.

27.    On January 20, 2023, Plaintiff made the final payment of $336.55, which satisfied the outstanding balance and closed the Upgrade Account.

28.    Uplift experienced a system issue affecting payments made on January 20, 2023.

29.    On January 24, 2023, Uplift confirmed to Plaintiff in writing that his January 20 payment had succeeded, his loan was "completely paid off," and the balance was $0.00.

30.    Uplift also told Plaintiff it would refund $333.82 and $2.73 to correct the payment-system issue.

31.    Thus, the Upgrade Account was never delinquent, was paid in full as of January 20, 2023, and had no legitimate activity after January 2023

## Equifax Initially Reports the Account Accurately

32.    As of August 31, 2025, Equifax reported the account under the name Uplift, Inc..

33.    At that time, Equifax accurately reported that the account had a $0 balance, was paid as agreed, had no reported delinquency, and had last activity in January 2023.

34.    Equifax's August 2025 reporting concerning Plaintiff also reflected a six-month term and no late-payment history.

35.    Accordingly, Equifax possessed and maintained accurate historical information concerning the account before the inaccurate reporting described below appeared.

## The Uplift-to-Upgrade Transition Creates False Severe Delinquencies

36.    In or around November 2025, Uplift transitioned to Flex Pay by Upgrade, and Upgrade began updating Uplift tradelines to report under the Upgrade name.

37. During or shortly after that transition, the Upgrade application displayed a purported transaction of $0.05 dated November 11, 2025, on Plaintiff's already paid-off account, even though the prior transaction shown was Plaintiff's final January 20, 2023, payment.

38. The $0.05 entry was not a missed payment, did not create a legitimate balance, and did not make Plaintiff delinquent.

39. Nevertheless, Equifax changed its historically accurate reporting and began reporting the Upgrade Account with an extensive, severely derogatory payment history.

40. Equifax reported the Upgrade Account as 120 or more days past due for numerous months, including at least April 2024 through November 2025, even though the account had been paid off more than a year before the earliest reported delinquency.

41. Equifax also reported an inaccurate closed date in November 2025 and inaccurate last activity in November 2025.

42. The reporting was internally inconsistent: Equifax simultaneously described the account as "paid as agreed" with a $0 balance while also reporting a worst delinquency of "120+ days past due" and a long string of severe late-payment notations.

43.    The derogatory history was false because Plaintiff never made a late payment, the balance was $0, and the account had been paid and closed since January 20, 2023.

44.    The inaccuracy was material because a recent series of severe delinquencies communicates that a consumer repeatedly failed to satisfy a payment obligation and presents a substantially greater credit risk.

### Plaintiff's January 2026 Disputes and Upgrade's First Correction Request

45.    Plaintiff discovered the inaccurate Upgrade Account while reviewing his credit information in January 2026.

46.    Because the account had previously been accurately reported and now appeared under a different company name with a delinquency history he did not recognize, Plaintiff initially feared the tradeline might be fraudulent.

47.    On or about January 12, 2026, Plaintiff submitted an online dispute to Equifax concerning the inaccurate Upgrade Account.

48.    In that initial dispute, Plaintiff explained, in substance, that he did not recognize the newly derogatory account as his because his genuine Uplift account had been paid in full and had never been late.

49.    On or about January 14, 2026, after reviewing Plaintiff's credit-reporting claim, Upgrade told Plaintiff in writing that it would update its internal

records and had submitted an update request to Equifax, Experian, and Trans Union.

50. Upgrade thanked Plaintiff for providing it an opportunity to "correct" his credit report.

51. Equifax completed its first reinvestigation on or about January 29, 2026 but failed to remove the false delinquency history.

52. On January 31, 2026, Plaintiff submitted a second online dispute to Equifax, confirmation number 6031542278.

53. Plaintiff specifically explained: "THIS ACCOUNT WAS NEVER DELINQUENT. IT WAS CLOSED IN 2023 PAID IN FULL. THE CREDITOR MADE AN ERROR WHEN THEY TRANSFERRED THE ACCOUNT FROM UPLIFT TO UPGRADE."

54. Plaintiff attached Uplift's January 24, 2023 paid-in-full confirmation and Upgrade's January 14, 2026 correction email.

55. These documents established from Upgrade's own records that the loan was paid, closed, and not delinquent.

56. Upon information and belief, Equifax transmitted Plaintiff's dispute and relevant information to Upgrade through an Automated Consumer Dispute Verification ("ACDV") or other automated dispute mechanism.

57. Upon information and belief, Equifax contacted Upgrade as part of Equifax's reinvestigation.

58.     On February 10, 2026, Upgrade submitted another correction request to the consumer reporting agencies directing that the account be reported "paid in full" as of January 20, 2023 with zero late marks.

59.     Upgrade assigned AUD control number 16032965 to that correction request.

60.     Despite the documentary proof and Upgrade's correction request, on or about February 19, 2026, Equifax completed the January 31 reinvestigation without removing the false delinquency history.

61.     Equifax failed to conduct a reasonable reinvestigation of Plaintiff's January 2026 Disputes, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

## Plaintiff's February 2026 Disputes

62.     On February 20, 2026, Plaintiff submitted a third online dispute to Equifax, confirmation number 6051539452.

63.     Plaintiff explained that the account history was incorrect, the account was never past due, Upgrade said it had corrected the error, and Experian and Trans Union were reporting the account correctly while Equifax alone continued reporting it inaccurately.

64.    Plaintiff supported the dispute with: (a) a screenshot of the Upgrade application showing the account was paid off; (b) Uplift's January 2023 paid-in-full email; and (c) Upgrade's January 2026 correction email.

65.    The application screenshot showed the final January 20, 2023 payment and the anomalous $0.05 entry posted on November 11, 2025 to an account that the application identified as "paid off."

66.    Upon information and belief, Equifax transmitted the February 20 dispute and relevant information to Upgrade through an ACDV or similar dispute mechanism.

67.    Upon information and belief, Equifax contacted Upgrade as part of its February reinvestigation, even though Plaintiff had already provided Equifax with Upgrade's own records confirming that every payment was timely and the account had been paid and closed in January 2023.

68.    On the same date, Plaintiff filed CFPB complaints against both Equifax and Upgrade concerning the continuing inaccurate reporting.

69.    In his CFPB complaint against Equifax, Plaintiff explained that Uplift had never reported the account late, the account had closed in January 2023, the false delinquencies appeared only after the transfer to Upgrade, and Upgrade had acknowledged the mistake and requested correction.

70. Plaintiff also informed Equifax that Experian and Trans Union were reporting the account correctly.

71. On February 28, 2026, Equifax declined to investigate the CFPB dispute, labeling it frivolous because another dispute concerning the item was already pending.

72. Equifax did not identify any missing information needed to investigate; instead, Plaintiff had provided unusually specific information and multiple documents from the furnisher itself.

73. On or about March 12, 2026, Equifax completed the pending direct reinvestigation but again failed to remove the false delinquency history.

74. Equifax failed to conduct a reasonable reinvestigation of Plaintiff's February 2026 Dispute(s), or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Upgrade Expressly Confirms the Reporting Is Wrong**

75. On March 5, 2026, Upgrade responded in writing to Plaintiff's February CFPB complaint.

76. Upgrade confirmed that Plaintiff obtained the six-month loan on July 20, 2022, that the final January 20, 2023 payment satisfied the balance and closed the account, and that all payments had been received on time.

77.    Upgrade further admitted that it had found a "discrepancy" with the reporting of Plaintiff's Upgrade Account.

78.    Upgrade confirmed that it had submitted the February 10, 2026 request, under AUD control number 16032965, to report the account paid in full as of January 20, 2023 with zero late marks.

79.    Thus, by no later than March 5, 2026—and in fact by January 14, 2026—Upgrade knew its own records disproved every late-payment notation appearing on Equifax's reporting of the account.

80.    Nevertheless, Equifax's reinvestigation results represented that the furnisher "verified" the disputed reporting, and Equifax continued to report the severe delinquency history.

81.    Equifax's representation that the furnisher verified the disputed reporting was irreconcilable with the records Plaintiff supplied, Upgrade's written admissions, Upgrade's AUD correction, and Upgrade's repeated requests that Equifax remove every delinquency.

82.    At minimum, that conflict required Equifax to do more than continue parroting a purported automated verification that was contradicted by the entire documentary record.

**Equifax Publishes the Inaccuracy and Plaintiff Receives Unfavorable Credit Terms**

83.    On or about February 15, 2026, Plaintiff applied through Upstart for a personal loan funded by DR Bank.

84.    In connection with the application, Equifax, in accordance with its standard procedures, prepared and furnished a consumer report concerning Plaintiff to Upstart, DR Bank, or an entity acting on their behalf.

85.    The consumer report contained the false Upgrade Account delinquency history.

86.    Plaintiff was approved for only $600 in amount financed at an annual percentage rate of 35.94%, with a disclosed finance charge of $123.15 and total scheduled payments of $723.15.

87.    Upon information and belief, the severe and recent Upgrade Account delinquency materially contributed to the unfavorable terms because it falsely portrayed Plaintiff as having been severely delinquent on a recent installment obligation for many consecutive months.

88.    Defendant's inaccurate reporting of the Upgrade Account caused an approximate forty-point decline in Plaintiff's Equifax credit score and impaired his access to ordinary, reasonably priced credit.

89.     By reporting the Upgrade Account with the erroneous delinquency history in the credit file and consumer report concerning Plaintiff to Upstart and/or DR Bank, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports in violation of 15 U.S.C. § 1681e(b).

**A Second Equifax Publication Results in Additional Unfavorable Terms**

90.     On March 10, 2026, Plaintiff applied through Upstart for another personal loan, this one funded by Cross River Bank.

91.     In connection with the application, Equifax, in accordance with its standard procedures, prepared and furnished a consumer report concerning Plaintiff to Upstart, Cross River Bank, or an entity acting on their behalf.

92.     That consumer report continued to contain the false Upgrade Account delinquency history despite Plaintiff's prior disputes and Upgrade's correction requests.

93.     Plaintiff was approved for $1,232 in amount financed at an annual percentage rate of 29.8%, with a disclosed finance charge of $1,152.75 and total scheduled payments of $2,384.75.

94.     Upon information and belief, the offered terms were materially less favorable than the terms available to consumers whose reports did not falsely reflect a recent series of severe delinquencies.

95.  The inaccurate Upgrade reporting diminished Plaintiff's purchasing power and forced him to consider or use high-cost credit because ordinary lenders' prequalification processes would not offer him reasonable terms.

96.  By reporting the Upgrade Account with the erroneous delinquency history in the credit file and consumer report concerning Plaintiff to Upstart and/or Cross River Bank, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports in violation of 15 U.S.C. § 1681e(b).

## Plaintiff's March 2026 Disputes

97.  On March 18, 2026, Plaintiff submitted another online dispute to Equifax, confirmation number 6077525882.

98.  Plaintiff explained that he had complained about Equifax's misreporting repeatedly, the account had never been late, Upgrade had confirmed that fact multiple times, and Equifax was the only nationwide consumer reporting agency reporting the account incorrectly.

99.  Plaintiff attached Upgrade's March 5, 2026 letter, which established from the furnisher's records that all payments were timely and provided the correction control number.

100. Upon information and belief, Equifax transmitted the March dispute and relevant information to Upgrade through an ACDV or similar dispute mechanism.

101. Upon information and belief, Equifax again contacted Upgrade as part of Equifax's March reinvestigation.

102. Also on March 18, 2026, Plaintiff filed additional CFPB complaints against Equifax and Upgrade, attaching Upgrade's admission and again identifying the continuing false delinquency history.

103. The March CFPB complaint specifically explained that Equifax was reporting approximately twenty-four months of severe delinquencies on an account that Upgrade had confirmed was never late.

**Equifax Claims the Account Is Corrected but Continues the False Reporting**

104. On or about April 10, 2026, Equifax completed its reinvestigation of Plaintiff's March dispute but failed to remove the false delinquency history.

105. An Equifax report updated April 10, 2026, continued to report the Upgrade Account with a worst delinquency of "120+ days past due" and monthly 120-day-late notations for April 2024 through November 2025.

106. That report also continued to list an inaccurate November 2025 closed date and November 2025 last activity.

107. On April 13, 2026, Equifax responded to Plaintiff's March CFPB complaint and represented that the Upgrade Account was reporting "paid as agreed, with no late payments" and that the account history had been modified.

108. Equifax's representation was contradicted by its April 10 report and by the later reporting described below.

109. Equifax therefore either failed to make the correction it represented had been made or allowed the false delinquency history to reappear without maintaining reasonable procedures to prevent reappearance.

110. Equifax's response also listed multiple Upgrade and Uplift tradelines and modifications in a manner that did not meaningfully explain why the specific account ending in 1490 continued to display severe delinquencies.

111. Equifax failed to conduct a reasonable reinvestigation of Plaintiff's March 2026 Dispute(s), or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

### Upgrade Represents Equifax Has Not Implemented Its Requests

112. On May 15, 2026, Upgrade responded to Plaintiff's March CFPB complaint.

113. Upgrade represented that it had submitted "multiple requests to Equifax" to remove all delinquencies from the Upgrade Account.

114.    Upgrade further stated: "However, as you note, Equifax has not updated its reporting."

115.    Upgrade promised to continue working with Equifax to remove the delinquency history and apologized for the inconvenience.

116.    Upgrade's May response demonstrates that the dispute concerned a factual, readily verifiable error and that the continued inaccurate reporting was not the product of any legitimate disagreement about what Plaintiff owed or whether his payments were timely.

117.    Upgrade's response confirms that Equifax knew or should have known the correction had not been effectively implemented, yet the Upgrade Account remained in Plaintiff's Equifax file with the inaccurate delinquency history.

## The False Reporting Remains in June 2026

118.    Plaintiff obtained an updated Equifax credit report through myFICO on or about June 6, 2026.

119.    The updated report continued to report severe delinquency history on the Upgrade Account, including repeated late-payment notations extending through November 2025.

120.    Equifax's latest dispute information also reflected inaccurate dates of last payment, last activity, and closure in November 2025, even though the actual last payment and closure occurred on January 20, 2023.

121. Accordingly, the false reporting remained after at least four direct disputes, two CFPB complaints to Equifax, multiple notices to Upgrade from Equifax, and multiple correction requests from Upgrade.

### Equifax's Automated Reinvestigation Process

122. The nationwide consumer reporting agencies and furnishers commonly exchange consumer disputes and investigation results through e-OSCAR using ACDVs and Automated Universal Dataforms ("AUDs").

123. An ACDV permits a consumer reporting agency to transmit the nature of a consumer's dispute and relevant information to the furnisher that supplied the disputed data.

124. An AUD permits a furnisher to send a proactive correction to a consumer reporting agency.

125. Equifax was required to provide Upgrade all relevant information it received from Plaintiff concerning each dispute, including Plaintiff's supporting documents. 15 U.S.C. § 1681i(a)(2).

126. Plaintiff's disputes were not vague or conclusory. They identified the precise account, the precise fields in error, the correct payoff and closure date, and the Uplift-to-Upgrade transition.

127. Plaintiff also supplied records generated by Upgrade and Uplift that conclusively established the Upgrade Account was paid in full and never late.

128.    A reasonable reinvestigation by Equifax would have compared its pre-transition August 2025 reporting with the post-transition tradeline, recognized the impossibility of delinquencies arising long after a paid-off account closed, and resolved the conflict instead of repeatedly retaining the furnisher's facially inconsistent data.

129.    A reasonable reinvestigation would also have reconciled any automated response with Upgrade's payment records, payoff confirmation, written admissions, January 2026 correction request, February 2026 AUD, and May 2026 confirmation that Equifax had not implemented multiple correction requests.

130.    Equifax's repeated failure to correct a simple, documented error demonstrates that its procedures did not reasonably account for errors arising when a furnisher migrated or renamed a previously accurate tradeline.

**Plaintiff's Damages**

131.    Equifax's reporting falsely portrayed Plaintiff as having a recent and prolonged history of severe nonpayment, when Plaintiff had paid the Upgrade Account in full and on time years earlier.

132.    Equifax's conduct caused a substantial decline in Plaintiff's Equifax credit score and deprived him of the ability to benefit from his true credit history.

133. Plaintiff was offered personal loans at annual percentage rates of 35.94% and 29.8%, resulting in reduced purchasing power and actual or imminent finance costs that would not have existed on the same terms absent the false severe delinquency.

134. Plaintiff avoided additional applications for ordinary credit because Equifax identified a "serious recent delinquency" on his file and soft-pull prequalification processes did not offer reasonable terms.

135. Plaintiff was forced to consider or use high-cost credit sources to meet his financial needs.

136. Plaintiff spent substantial time and effort submitting disputes, collecting records, contacting Equifax and Upgrade, filing CFPB complaints, reviewing responses, and monitoring his credit reports.

137. Plaintiff took approximately two days away from work specifically to attempt to correct Equifax's reporting.

138. The continuing false reporting caused Plaintiff anxiety, stress, frustration, embarrassment, loss of sleep, and ongoing fear about his ability to obtain credit and maintain household financial stability.

139. Plaintiff's anxiety increased to the point that his anti-anxiety medication dosage was increased.

140. Plaintiff suffered these injuries notwithstanding other isolated derogatory items in his credit history because the Upgrade Account falsely reported a uniquely severe, recent, and prolonged delinquency extending for approximately two years.

141. As a direct and proximate result of Equifax's conduct, Plaintiff suffered loss of credit opportunity, unfavorable credit terms, reduced purchasing power, damage to his credit rating, expenditure of time and effort, lost work time, and emotional distress, including anxiety, sleeplessness, frustration, humiliation, and embarrassment.

**Equifax's Conduct Was Willful or, at Minimum, Negligent**

142. Equifax knew the account had previously been accurately reported as paid as agreed, with no late payments, a $0 balance, and January 2023 last activity.

143. Equifax also received multiple disputes and documents directly from Plaintiff, at least one furnisher AUD with a control number, multiple correction requests from Upgrade, and information that Experian and Trans Union were reporting the account correctly.

144. Equifax nevertheless continued publishing the severe delinquency history, and even represented to the CFPB that the account had been corrected while the derogatory history remained or reappeared.

145. Equifax's failures were not isolated clerical mistakes. They persisted through repeated disputes and correction attempts over several months after Equifax possessed conclusive evidence of the error.

146. At all relevant times, Equifax acted by and through its agents, employees, and representatives who were acting within the course and scope of their authority.

147. Equifax is aware of the shortcomings of their procedures and intentionally chooses not to comply with the FCRA to lower their costs.

148. Equifax's conduct was knowing, intentional, reckless, and in conscious disregard of Plaintiff's rights under the FCRA, rendering Equifax liable for willful noncompliance under 15 U.S.C. § 1681n.

149. Alternatively, Equifax failed to exercise reasonable care and is liable for negligent noncompliance under 15 U.S.C. § 1681o.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim Against Defendant Equifax)**

150. Plaintiff repeats and realleges the foregoing allegations as if set forth in full herein.

151. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer

26/30

reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

152.   On at least two occasions in 2026, Defendant prepared a patently false consumer report concerning Plaintiff.

153.   Defendant readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's credit worthiness.

154.   Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

155.   As a result of Defendant Equifax's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

156. Defendant's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

157. Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Against Defendant Equifax)**

158. Plaintiff repeats and realleges the foregoing allegations as if set forth in Paragraph Nos. 1-149 as if fully stated herein.

159. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

160. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

161. Equifax violated 15 U.S.C. § 1681i by failing to conduct reasonable reinvestigations of Plaintiff's disputes; failing to meaningfully review and consider all relevant information; failing to delete or modify inaccurate or unverifiable information; and, to the extent the information was deleted and later reappeared, failing to maintain reasonable procedures to prevent its reappearance.

162. Equifax also acted unreasonably by treating a documented CFPB dispute as frivolous merely because a related direct dispute was pending, without addressing the new documentation and the repeated failure of prior reinvestigations.

163. Equifax's violations were a direct and proximate cause of Plaintiff's damages.

164. As a result of Equifax's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

165. Equifax's conduct was willful, rendering it liable for actual or statutory damages and punitive damages under 15 U.S.C. § 1681n. Alternatively, Equifax's

conduct was negligent, rendering it liable for actual damages under 15 U.S.C. § 1681o.

166.   Plaintiff is entitled to recover reasonable attorneys' fees and costs under 15 U.S.C. §§ 1681n and 1681o.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that the Court enter a judgment awarding Plaintiff actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs, pre-judgment and post-judgment interest as allowed by law, and awarding Plaintiff such other and further relief as the Court may deem appropriate and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 22nd day of July 2026.

By: */s/ David Pinkhasov*
David Pinkhasov, FL # 1040933
CONSUMER ATTORNEYS PLLC
68-29 Main Street
Flushing, NY 11367
T: (718) 701-4605
F: (718) 247-8020
E: dpinkhasov@consumerattorneys.com

*Attorneys for Plaintiffs,*
*John Vincent Brozowski*